DURIE TANGRI LLP
DARALYN J. DURIE (SBN 169825)
ddurie@durietangri.com
JOSEPH C. GRATZ (SBN 240676)
jgratz@durietangri.com
MICHAEL A. FELDMAN (SBN 295780)
mfeldman@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:415-362-6666
Facsimile: 415-236-6300

Attorneys for Defendant
CORELOGIC, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MULTIPLE LISTING SERVICE REAL ESTATE PHOTO LITIGATION | Case No. 3:14-cv-01158-BAS-JLB |
| | **DEFENDANT CORELOGIC, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| | Date:   August 17, 2015<br>Ctrm:  4B (4th Floor - Schwartz)<br>Judge: Honorable Cynthia Bashant |
| | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................... 1

II.  FACTUAL BACKGROUND ...................................................................... 2

III. ARGUMENT ............................................................................................ 6

A.   Plaintiffs' Reliance on Allegations of the Complaint Is Misplaced ............... 7

B.   The Class Is Not Ascertainable ............................................................. 8

  1.   Class membership depends on the presence of CMI. ........................ 10

  2.   Class membership depends on whether there was metadata
       embedded in images when they were uploaded to the MLS. ............. 13

  3.   Class membership depends on which version of CoreLogic's
       software was involved in the image upload. ..................................... 14

C.   The Rule 23(a) Requirements ............................................................. 15

  1.   Numerosity ................................................................................... 15

  2.   Existence of at least one common question ....................................... 16

  3.   Typicality ...................................................................................... 16

  4.   Adequacy of representation ............................................................. 17

D.   No Class May Be Certified Under 23(b)(2) ......................................... 18

E.   The Rule 23(b)(3) Requirements Are Not Met .................................... 18

  1.   Individual questions, not common questions, predominate. ............. 18

    a.   The Law of Predominance ........................................................ 18

    b.   Individualized inquiry is required to determine whether
         particular class members are contractually barred from
         bringing their claims. .............................................................. 20

    c.   Each class member's differing license terms requires an
         individualized inquiry that defeats predominance. .................... 20

    d.   Individualized issues predominate with respect to
         CoreLogic's implied license defense. ....................................... 22

    e.   Individual questions predominate with respect to the
         scope of the license or transfer of rights granted to the
         MLS. ....................................................................................... 23

    f.   Individual questions predominate with respect to whether
         visible CMI was present. .......................................................... 23

# TABLE OF CONTENTS (CONT'D)

**Page**

2. A class action is not superior to other available methods for fairly and efficiently adjudicating the controversy. ............................ 24

IV.   CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Affordable Aerial Photography, Inc. v. Realty Associates Florida Properties, Inc.*,
   No. 9:15-cv-80355-DMM (S.D. Fla. Mar. 18, 2015) ................................... 17

*Affordable Aerial Photography, Inc. v. Virtual Global Realty LLC*,
   No. 9:15-cv-81037-JIC (S.D. Fla. July 24, 2015) ....................................... 17

*Algarin v. Maybelline, LLC*,
   300 F.R.D. 444 (S.D. Cal. 2014) ................................................................. 8

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) .................................................................................. 19

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
   No. 06cv02671 BTM (WMc), 2012 WL 3762440 (S.D. Cal. Aug. 28, 2012) ........................................................................................................ 24

*Asset Mktg. Sys., Inc. v. Gagnon*,
   542 F.3d 748 (9th Cir. 2008) .................................................................... 22

*Bruton v. Gerber Prods. Co.*,
   No. 12-CV-02412-LHK, 2014 WL 2860995 (N.D. Cal. June 23, 2014) ...................... 8

*Connelly v. Hilton Grand Vacations Co.*,
   294 F.R.D. 574 (S.D. Cal. 2013) .......................................................... 18, 19

*Fischer v. Forrest*,
   No. 14 CIV. 1304 (PAE), 2015 WL 195822 (S.D.N.Y. Jan. 13, 2015) ...................... 25

*Frost-Tsuji Architects v. Highway Inn, Inc.*,
   No. 13-00496 SOM, 2015 WL 263556 (D. Haw. Jan. 21, 2015), *appeal docketed*, No. 15-15802 (9th Cir. Apr. 22, 2015) .................................... 25

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   903 F.2d 176 (2d Cir. 1990) ...................................................................... 16

*Geophysical Servs., Inc. v. TGS-Nopec Geophysical Servs.*,
   No. 14-1368, 2015 WL 1461235 (S.D. Tex. Mar. 30, 2015) ......................... 25

*Guzman v. Bridgepoint Educ., Inc.*,
   305 F.R.D. 594 (S.D. Cal. 2015) .......................................................... 18, 20

*Guzman v. Hacienda Records, L.P.*,
   No. 6:13-CV-41, 2015 WL 789113 (S.D. Tex. Feb. 24, 2015) ...................... 25

*Hanon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................... 17

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

**Page(s)**

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ................................................................. 16

*Hanover Architectural Serv., P.A. v. Christian Testimony-Morris, N.P.*,
   No. 2:10-5455 (KM), 2015 WL 3462889 (D.N.J. May 18, 2015),
   *reconsideration denied*, No. 2:10-5455 KM, 2015 WL 4461327 (D.N.J.
   July 21, 2015) ....................................................................................... 25

*Howard v. Gap, Inc.*,
   No. C 06-06773 WHA, 2009 WL 3571984 (N.D. Cal. Oct. 29, 2009) ........................ 19

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
   No. 08md1988 DMS (WMC), 2011 WL 6325877 (S.D. Cal. Dec. 16,
   2011) ................................................................................................... 19

*In re Google Inc. Gmail Litig.*,
   No. 13-MD-02430-LHK, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ................... 19

*In re Hulu Privacy Litig.*,
   No. C 11-03764 LB, 2014 WL 2758598 (N.D. Cal. June 17, 2014) ........................ 9

*In re Infineon Techs. AG Sec. Litig.*,
   266 F.R.D. 386 (N.D. Cal. 2009) .............................................................. 18

*Kober Hanssen Mitchell Architects, Inc. v. Wilson Care Home Kailua, LLC*,
   No. 14-00479 DKW, 2015 WL 237322 (D. Haw. Jan. 16, 2015) ........................... 25

*Mazur v. eBay Inc.*,
   257 F.R.D. 563 (N.D. Cal. 2009) ................................................................ 8

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ..................................................................... 7

*McPherson v. Seaduced, LLC*,
   No. 8:14-cv-2315-T-33EAS, 2015 WL 1811029 (M.D. Fla. Apr. 21,
   2015) ................................................................................................... 25

*Murphy v. Millennium Radio Grp. LLC*,
   No. 08-1743 MAS, 2015 WL 419884 (D.N.J. Jan. 30, 2015) ............................... 25

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
   238 F.R.D. 482 (C.D. Cal. 2006) ............................................................... 19

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
   No. 12-cv-01685-BAS (JLB), 2015 WL 1309938 (S.D. Cal. Mar. 24,
   2015) ................................................................................................... 19

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014), *reh'g en banc denied*, 784 F.3d 571 (9th
   Cir. 2015) ............................................................................................. 7

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Schwartz v. Harp*,
   108 F.R.D. 279 (C.D. Cal. 1985) .................................................................. 16

*Spencer v. Beavex, Inc.*,
   No. 05-CV-1501 WQH (WMc), 2006 WL 6500597 (S.D. Cal. Dec. 15,
   2006) ....................................................................................................... 8, 9

*Stemple v. QC Holdings, Inc.*,
   No. 12-cv-01997-BAS (WVG), 2014 WL 4409817 (S.D. Cal. Sept. 5,
   2014) .......................................................................................................... 18

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009) ...................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .................................................................................. 7

*Watson v. Kappa Map Grp., LLC*,
   No. 1:14-CV-100-TWT, 2015 WL 3932425 (N.D. Ga. June 25, 2015) ..................... 25

*Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*,
   No. C 05-2320 SBA, 2006 WL 2642528 (N.D. Cal. Sept. 14, 2006) ........................... 8

*Williams v. Cavalli*,
   No. CV 14-06659-AB, 2015 WL 1247065 (C.D. Cal. Feb. 12, 2015) ........................ 25

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ............................................................... 19, 24

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ..................................................................... 18

**Statutes**

17 U.S.C. § 1202 ...................................................................................passim

17 U.S.C. § 1203 ................................................................................ 16, 24

**Other Authorities**

7AA Charles Wright,
   Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 1779
   (3d ed. 2005) ............................................................................................. 24

S. Rep. No. 105-190 (1998) .......................................................................... 11

**Rules**

Fed. R. Civ. P. 23 .................................................................. 16, 18, 24

# I.  INTRODUCTION

Plaintiffs Steven Vandel and Robert Stevens, and Stevens' company Affordable Aerial Photography ("Plaintiffs") ask this Court to be the first to certify a class to pursue claims under 17 U.S.C. § 1202.  The Court should decline that invitation.

Plaintiffs bring claims on behalf of a putative class of professional photographers and real-estate agents who took photographs to be used in connection with real-estate listings posted to Multiple Listing Services, or "MLSes."  CoreLogic provides software and services to MLSes, and the claims arise out of the uploading of the photos to MLSes running CoreLogic software.

One might expect that, in such a situation, the claims in this case would be claims for infringement of copyright by reason of some allegedly wrongful act of copying.  But those claims are conspicuously absent in the Second Amended Complaint, because CoreLogic gets all of the necessary licenses with respect to the photos through its contracts with those MLSes.  Because CoreLogic is not accused of infringing copyright, Plaintiffs are attempting to sue CoreLogic for copying *only some and not all* of the information in the uploaded image files, ostensibly in violation of 17 U.S.C. § 1202, which makes it unlawful to "intentionally remove or alter any copyright management information ("CMI")" "having reasonable grounds to know[] that it will induce, enable, facilitate, or conceal an infringement of [copyright]."  17 U.S.C. § 1202(b).

No class can be certified here because:

- Photographers have inconsistent practices with respect to whether they ever include CMI in photographs;

- Common photo-editing tools can remove metadata before a photo ever reaches CoreLogic software and there is no way to tell after-the-fact;

- Rightsholders contract with real-estate agents (in some cases orally) and with MLSes and the contractual terms vary and require individualized proof;

- One of the named Plaintiffs and class counsel is in active litigation against several absent class members; and

1

- There are already adequate incentives for individual litigation.

## II.    FACTUAL BACKGROUND

CoreLogic provides software and services to real estate multiple listing services ("MLSes"), which are owned by associations of real-estate agents.  Real-estate agents join MLSes and upload their real-estate listings, including property descriptions and photographs.  Other real-estate agents and members of the public can then view those listings to find properties for sale.  Real-estate agents typically have the right to upload photographs either because they snapped the photographs themselves or because they licensed them from a professional real-estate photographer for use in a real-estate listing. Declaration of Kevin McQueen ("McQueen Decl.") Ex. A ¶ 11; Declaration of Gerald Bybee ("Bybee Decl.") Ex. A ¶ 37.  In some cases, the photographer may upload the photographs to the MLS on the agent's behalf.  Declaration of Joseph C. Gratz ("Gratz Decl.") Ex. 1 at 5, 11:18-20.

Plaintiff Vandel is such a professional real-estate photographer.  He is typically hired by real-estate agents and testified that his dealings with the agents were and are oral, he understood that his photos were being licensed for the purpose of being uploaded to an MLS, and he did not recall ever orally conveying any limitation on the scope of the license being granted, including any instruction that his photos could not be modified. Gratz Decl. Ex. 1 at 26-27, 91:14-92:11.  Shortly before the filing of this lawsuit, Vandel added licensing terms to his website, but never directed any of his customers to review these terms, and continued to do business entirely by means of oral communications.  *Id*. at 28, 98:18-24; *see also* Gratz Decl. Ex. 2, 34 & 37.

Plaintiff Stevens is also a professional real-estate photographer; Affordable Aerial Photography is his business.  Stevens testified that all copyrights in his photographs are owned by Affordable Aerial Photography and he can identify no harm he himself has experienced as a result of the facts pleaded in the SAC.  Gratz Decl. Ex. 3 at 59-60, 191:17-192:21.  While Stevens' invoices include a "NOTICE OF COPYRIGHT," he testified that the actual terms governing his licenses are delivered orally.  *Id*. at 56; 58,

2

161:5-12; 165:11-17.  Stevens testified that, with respect to images licensed directly from Affordable Aerial Photography by real-estate agents, they may do as they wish with the photos, so long as they are used only in connection with a particular property listing, and not in connection with a different property listing.  *Id*. at 57-58, 164:10-165:4.  And while images purchased through AAP's website, StockImageDepot.com, are purportedly subject to a restrictive, 1,474-word "Purchase Agreement," Gratz Decl. Ex. 4 at 65-67, Stevens testified that in fact he has not carefully reviewed that agreement (which came with his website's software), and that notwithstanding its terms, a licensee of photos on StockImageDepot.com may do as he wishes with the photos, *including* using them in connection with multiple different property listings.  Gratz Decl. Ex. 3 at 63, 231:10-18.

Real-estate agents also take real-estate photos and upload them to MLSes and are thus also members of the putative class.  Gratz Decl. Ex. 3 at 50-51, 61:16-62:17.  Those agents are bound by agreements with the MLSes on which they list properties, which contain varying but strongly worded representations and warranties that the agent has the authority to upload the photos and data as well as a strongly worded license to the MLS conveying rights to use and sublicense use of the data.[1]  The participation agreements themselves often require the agent to provide the same kinds of representations and warrantees about their right to use and license photographs and may specifically forbid the agents from challenging the MLS's rights to use them.[2]  The MLS organizations, in turn,

---

[1] For instance, the REcolorado agreement states, in part, "The Participant hereby grants to REcolorado an irrevocable, non-exclusive license to use any and all information, data, and tangible or intangible property items including, but not limited to, real estate listings, textual data, photographs and images, and all other real estate information provided to REcolorado by the Participant or any of his/her Licensees." Gratz Decl. Ex. 5 at 68 ¶ 1.  Likewise, the CTMLS agreement states "Participant hereby grants to MLS a non-exclusive, irrevocable, worldwide, royalty free license to use, sublicense through multiple tiers, publish, display, and reproduce the Listing Content, to prepare derivative works of the Listing Content, and to distribute the Listing Content or any derivative works thereof." Gratz Decl. Ex. 6 at 73 ¶ 7(b).

[2] For instance, the REcolorado agreement states in part: "REcolorado may use, or may

have agreements with CoreLogic that permit CoreLogic to store and use the images and make modifications to them.  McQueen Decl. Ex. A ¶ 12.

Photographers have different practices with respect to the use of visible CMI—legends or watermarks on photos that indicate where the photo came from.  Plaintiff Vandel testified that he sometimes does and sometimes does not apply the visible text "(c) Square Foot Studios" to his photos and that his practice has been inconsistent in the past. Gratz Decl. Ex. 1 at 9, 43:6-9.  He currently applies that text when he remembers to enable the feature to do so, except when he deliberately decides that he does not want his name associated with a particular property listing.  *Id*. at 11-12, 52:16-53:6.  Stevens, for his part, testified that until 2014, he only applied visible watermarks to photos he considered "high-value," which he expected were at risk of being re-used in multiple property listings, and that he felt it was important to "protect."  Gratz Decl. Ex. 3 at 53, 118:10-16.  Since 2014, he testified, he has had a general practice of applying visible CMI to all of the images he distributes.  *Id*. at 53-54, 118:24-119:4.

Metadata, which is not visible on the face of a photo, can also be added to photographs for the purpose of identifying the copyright holder ("copyright metadata"). The user must specifically choose to add this information and not all cameras and image-editing software even have this capability.  Bybee Decl. Ex. A ¶ 20.  Other metadata is automatically added by many cameras to provide technical information about the photograph—for example, what camera was used, what shutter speed was used, what exposure was used, when the photo was taken, and so on.  *Id*.

---

arrange for third parties to use, the information, data, and tangible or intangible property items in products and services . . . . By the act of submitting any real estate data and information to REcolorado, the Participant and his/her Licensees hereby consent to such uses and warrant that they will not challenge, interfere with or violate such uses, and warrant that they will not seek compensation therefore." Gratz Decl. Ex. 5 at 68 ¶ 1(c). Likewise, the CTMLS agreement states "Participant agrees not to challenge MLS's rights in and to the MLS Database or to take any action inconsistent with the license granted to the Listing Content under this Agreement." Gratz Decl. Ex. 6 at 74 ¶ 7(c).

Vandel testified that he considers CMI to be "identifying information that identifies a person or entity that owns copyright" and that camera metadata is CMI only when "bundled together" with "Author" or "Copyright" information.  Gratz Decl. Ex. 1 at 19-22, 66:18-69:5.  Some of the images he has delivered to clients have copyright metadata by virtue of his having turned on the feature of his camera that adds his name in the metadata of his photo, but he has not always had that feature enabled and he cannot estimate what percentage of his photos have been distributed without copyright metadata.  *Id*. at 24-25, 85:25-86:2 ("Q. Do you know what percentage of them did include your name in one of the metadata fields?  A. I do not."); *id*. at 10, 48:19-22 ("Q. Do you know whether you had included any name or company name metadata information in those photographs when you had provided them to the agent? A. I don't know.").  Indeed, some of the sample photos on Vandel's website have copyright metadata, and some do not.  Declaration of Mark Seiden ("Seiden Decl.") Ex. A ¶¶ 65-69.

Plaintiff AAP licenses real-estate photographs through two channels: by licensing photos to the parties that commissioned those photos, Gratz Decl. Ex. 3 at 55, 154:8-15, and through a website AAP operates, StockImageDepot.com.  Until sometime in 2013, none of the photos distributed by AAP had copyright metadata; images taken thereafter include Stevens' name.  *Id*. at 42-43; 41, 32:24-33:5; 31:6-11.  But after those photos are licensed to the party that commissioned them, the most marketable photos are made available for licensing on the StockImageDepot.com site.  Images licensed and downloaded from that website at the "Original" size (for $99) have some metadata about the camera, exposure, shutter speed, and so on, Gratz Decl. ¶¶ 8-9, Exs. 7-9, but the ones taken before 2013 do not have any copyright metadata identifying Stevens or AAP, because he only configured his camera to include that metadata in 2013.  Gratz Decl. Ex. 3 at 41, 31:6-11.  Moreover, no matter when purchased, images licensed and downloaded from the StockImageDepo.com website at the smaller 1600px size (for $45) do not contain any metadata at all, because—like CoreLogic's software—the software used by StockImageDepot.com to reduce the size of those images does not retain metadata when

images are resized.  Seiden Decl. Ex. A ¶¶ 44-48.  Stevens was not aware of this fact until his deposition because, as he testified, he had no reason to know that image metadata was lost as a side-effect of the operation of his image-resizing software.  Gratz Decl. Ex. 3 at 61, 212:2-10.  But, as the report of CoreLogic's expert Mark Seiden reflects, it is common for software that resizes or otherwise manipulates images—including many popular image-hosting and image-editing websites like Facebook, Instagram and Twitter—to make copies of image files that do not include the metadata.  Seiden Decl. Ex. A ¶¶ 40-43.

Although it is possible to look at photographs on MLSes and view the metadata associated with the image, neither Vandel nor Stevens has ever used any metadata associated with their photographs to track down an instance of copyright infringement. Gratz Decl. Ex. 1 at 6-8, 20:11-20, 34:14-21, 37:3-9; Ex. 3 at 46-48, 37:7-39:13.  Indeed, Vandel had not even checked to see whether the metadata was present on his photographs after they had been uploaded to an MLS prior to this lawsuit:  he was recruited to serve as a named plaintiff in this case and did not know that any metadata might not be present until his lawyer told him so.  Gratz Decl. Ex. 1 at 3, 7:2-7.  Neither Vandel nor Stevens claims that the lack of metadata from any of their photographs has facilitated an act of copyright infringement.  Gratz Decl. Ex. 1 at 13-14, 56:15-57:21; Ex. 3 at 62, 213:13-19.

Upon learning of the Plaintiffs' allegations, CoreLogic took prompt action, in an abundance of caution, to modify its software to copy image metadata when images are processed.  ECF No. 61 (Hedrick Decl.) ¶¶ 17, 21, 24.

## III.   ARGUMENT

The Motion for Class Certification does not set forth the definition of the class Plaintiffs seek to certify.  We presume that Plaintiffs seek to certify the class as defined in their Second Amended Complaint ("SAC"), ECF No. 34.  Paragraph 87 of the SAC recites:

> The Class is defined as all persons or entities that hold the copyright in one or more images stored in a digital file with metadata containing copyright management information that was uploaded to a multiple listing service and copyright management information metadata was removed, altered or falsified by CoreLogic or a CoreLogic product. Excluded from the Class are (a)

defendant and any entity in which any defendant has a controlling interest; (b) the employees, officers and directors of those identified in subparagraph (a); (c) the heirs, successors, assigns and legal representatives of the persons identified in subparagraph (b) above; and (d) a multiple listing service.

As set forth below, neither this nor any other class can be certified in this case.

### A. Plaintiffs' Reliance on Allegations of the Complaint Is Misplaced

Plaintiffs' Motion for Class Certification relies heavily on the allegations of the SAC. Indeed, the entire fact section of the brief consists of strung-together quotes from that pleading. Plaintiffs argue that "[a]t the class certification stage, the court must take the substantive allegations of plaintiffs' complaint as true and may certify a class without supporting evidence." Memorandum Supporting Plaintiffs' Class Certification Motion ("Mot.") at 6. In support of this proposition, they cite a 2010 Northern District of California case, which in turn cites a 1982 Ninth Circuit case. Unfortunately for Plaintiffs, the Supreme Court abrogated those holdings in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), holding that "Rule 23 does not set forth a mere pleading standard." "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* The Ninth Circuit has recognized the abrogation of its former rule, and now holds that a party seeking class certification "must affirmatively prove" that the Rule 23 requirements are met, not merely plead facts which would meet those requirements. *Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014), *reh'g en banc denied*, 784 F.3d 571 (9th Cir. 2015).

Similarly, the 1992 case Plaintiffs cite for the proposition that "a district court may certify a class without supporting evidence" is no longer good law. After *Wal-Mart*, the Ninth Circuit has held otherwise: "Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks and citation omitted).

When one sets aside the unsupported allegations of the SAC, there is virtually

nothing left.  Plaintiffs provide an expert declaration regarding the operation of CoreLogic's software and virtually identical declarations of the two named Plaintiffs which largely recite legal conclusions.  *See, e.g.*, ECF No. 59-4 (Vandel Decl.) ¶ 12 ("I believe that there are common questions of law or fact common to the proposed class."), ¶ 15 ("I believe that proceeding as a class action is superior than requiring each class member to file individual lawsuits."); ECF No. 59-9 (Stevens Decl.) ¶¶ 13, 16 (same).

### B.     The Class Is Not Ascertainable

"As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists."  *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).  "A class is ascertainable if it is defined by 'objective criteria' and if it is 'administratively feasible' to determine whether a particular individual is a member of the class."  *Bruton v. Gerber Prods. Co.*, No. 12-CV-02412-LHK, 2014 WL 2860995, at *4 (N.D. Cal. June 23, 2014).  "The Court must be able to determine class members without having to answer numerous fact-intensive questions."  *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*, No. C 05-2320 SBA, 2006 WL 2642528, at *3 (N.D. Cal. Sept. 14, 2006).  A class must be not only "ascertainable in the sense that there are objective criteria for determining who its members are," but also ascertainable "in the sense that members could actually ever be determined."  *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 455 (S.D. Cal. 2014).

The burden is on the plaintiffs, and where the "[p]laintiffs have failed to provide a reliable method of determining who the actual members of the class are," the class is not ascertainable.  *Id.*  The plaintiff may not shift the burden to the defendant by claiming that the defendant should have maintained its business records differently, in a way that would have made it possible to tell whether a given person is or is not a member of the class.  For example, in *Spencer v. Beavex, Inc.*, No. 05-CV-1501 WQH (WMc), 2006 WL 6500597 (S.D. Cal. Dec. 15, 2006), the class definition turned on whether the delivery drivers with whom the defendant had contracted drove the routes themselves most of the time or whether employees or subcontractors did so.  *Spencer* at *5.  The defendant only

kept records of the identity of the driver it contracted with, not who had actually driven each route. *Id.* at *7. The plaintiff argued that "the fact that Defendant, . . . has chosen not to maintain such records cannot be raised as a defense to . . . class certification[.]" *Id.* at *8. This Court disagreed and denied class certification, holding that in light of the absence of reliable records, "determining who actually drove a particular route on a given day [was] a potentially impossible task[,]" and that the plaintiffs "failed to show that it is administratively feasible to ascertain which drivers actually drove less than 51% of their routes." *Id.* at *9. *See also, e.g.*, *In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2014 WL 2758598, at *15 (N.D. Cal. June 17, 2014) (ascertainability requirement not met where defendant did not keep records of certain internet transmissions because existing records "would identify a large pool of users with only a subset of the pool suffering any injury.").

In order to be a member of the class, a person must "hold the copyright in one or more images stored in a digital file with metadata containing copyright management information that was uploaded to a multiple listing service and copyright management information metadata was removed, altered or falsified by CoreLogic or a CoreLogic product." ECF No. 34 ¶ 87. CoreLogic's software did not generally retain original, unmodified image files; only certain versions of one of the five software packages at issue, InnoVia, did so.[3] Declaration of Alex Troy ("Troy Decl.") ¶ 5. Thus, in order to identify a class member, one would ***first*** need to determine whether the class member placed metadata on his photos that constitutes copyright management information. ***Second***, one would need to determine whether that metadata remained intact at the point where it was first processed by any CoreLogic software—or whether it had been removed by other software, such as the software Stevens uses to run his photo-licensing website. ***Third***, one would need to determine to which MLS the image was uploaded and when,

---

[3] Neither the San Diego MLS (Sandicor) nor the South Florida MLS (BeachesMLS) has ever used the InnoVia software versions at issue, and thus there is no reason to think that the original, unmodified copies of the named Plaintiffs' photos were retained. Declaration of Albert McElmon ¶ 4.

both because CoreLogic's software has been updated to copy metadata when photos are resized or otherwise modified and because there were some circumstances in which CoreLogic's software, as configured on particular MLSes at particular times, did not need to resize or otherwise modify an uploaded image, and in those circumstances metadata was not removed. *Id.* ¶¶ 2 & 5. As set forth below, there is no administratively feasible method of making any of those determinations.

### 1. Class membership depends on the presence of CMI.

Section 1202 does not address removal of all metadata—only that which constitutes "copyright management information." 17 U.S.C. § 1202(b). The statute provides a definition of that term:

> As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:
>
> (1) The title and other information identifying the work, including the information set forth on a notice of copyright.
>
> (2) The name of, and other identifying information about, the author of a work.
>
> (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.
>
> (4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.
>
> (5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.
>
> (6) Terms and conditions for use of the work.
>
> (7) Identifying numbers or symbols referring to such information or links to such information.
>
> (8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the

10

provision of any information concerning the user of a copyrighted work. 17 U.S.C. § 1202(c). Congress's stated purpose for this provision was to protect the integrity of information that would be important to creating an electronic licensing market for copyrighted works on the Internet, fulfilling obligations under two multilateral treaties that require protection for "electronic rights management information." S. Rep. No. 105-190 at 34 (1998); *see* ECF No. 34 ¶ 34. As Plaintiffs recognize in the SAC, the treaty language Congress was implementing defines "rights management information" as "information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a work or appears in connection with the communication of a work to the public." ECF No. 34 ¶ 33.

Thus, where metadata includes the name of the photographer or of the copyright holder, that information is "copyright management information" because it sets forth the identity of the creator or copyright holder of the work. Other pieces of metadata that provide technical information about the photograph—for example, what camera was used, the shutter speed, the exposure, when the photo was taken, and so on—are not "copyright management information," because they do not identify the work, the author of the work, the owner of any right in the work, or provide information about the terms and conditions of use of the work. Had Congress intended to define CMI to include all metadata associated with a work, the above definition could have been much shorter.

Plaintiffs have been coy in setting forth their position as to what constitutes CMI. In their class certification motion, they refer to "information set forth in a notice of copyright" and "copyright management information (e.g. name of author or copyright owner"). However, in their interrogatory responses, they set forth dozens of things that they say constitute "copyright management information," including information far afield from copyright, such as "File Size," "Device Manufacturer" (apparently referring to the

manufacturer of the camera used to take the photograph), the date the photo was taken, and "Model Age" (apparently referring to the age of a person pictured in the photograph). *See, e.g.*, Gratz Decl. Ex. 10 at 88-91; Ex. 11 at 99-101.  This information does not identify the work, its creator, its copyright holder, or how the work may be used—and that means that it is not "copyright management information."  And, although the declarations of both named Plaintiffs state in conclusory fashion they use Exif metadata to help them identify and protect their digital photographs (without specifying the nature of the Exif metadata in question), both testified that they have never used any such data in connection with detecting infringement or enforcing their copyrights.  Gratz Decl. Ex. 1 at 6-8, 20:11-20, 34:14-21, 37:3-9; Ex. 3 at 44-48, 35:24-39:13.

There is no administratively feasible way of determining whether a given photo ever contained metadata of a type that would constitute "copyright management information" as that term is defined in § 1202.  Vandel testified that in some cases, he turned on a feature of his camera that adds his name in the metadata of his photo, but he had not always had that feature enabled.  Gratz Decl. Ex. 1 at 11, 52:16-23.  He did not have any estimate of what percentage of his photos had been distributed without copyright metadata.  *Id*. at 23-25, 84:17-86:2.  Indeed, some of the sample photos on Vandel's website have his name or that of his company in the metadata, and some have only information about the camera, shutter speed, and so on.  Seiden Decl. Ex. A ¶¶ 62-64.  Because Vandel did not have any consistent practice with respect to copyright metadata, the only way to determine whether any given photo ever had copyright metadata would be for him to search his archives, photo by photo, see which ones have copyright metadata, and then attempt to trace where those photos went, and whether and when they were uploaded to an MLS running CoreLogic's software.  Similarly, some images licensed and downloaded from the StockImageDepot.com website at the "Original" size are not resized, and have some metadata about the camera, exposure, shutter speed, and so on, but do not have any metadata identifying Stevens or AAP.  Gratz Decl. ¶¶ 8-9 & Exs. 7-8.  Thus, Stevens and AAP, like Vandel, have no consistent practice with respect to the

inclusion of copyright metadata, and determining whether copyright metadata was present on any particular image that was distributed to any particular licensee would require image-by-image investigation and evidence.

Plaintiffs have presented no reason to think that absent class members' practices with respect to copyright metadata are any more consistent than theirs are. Determining whether any of a particular photographer's images uploaded to an MLS running CoreLogic software contained copyright metadata will require an individualized, image-by-image inquiry. That inquiry will require having technicians examine the metadata on image files that may or may not have been kept by absent class members—and, as discussed in the next section, that may or may not represent the images in the form in which they were uploaded to an MLS running CoreLogic software.

> ### 2. Class membership depends on whether there was metadata embedded in images when they were uploaded to the MLS.

Even if it were administratively feasible to determine that copyright metadata was embedded in an image when it was created, the Court would still have to determine whether that metadata was still present at the time the image was uploaded to the MLS.

Named Plaintiff Affordable Aerial Photography provides a good example of why there is no administratively feasible method of determining whether there was any metadata on images at that time. AAP licenses real-estate photographs through two channels: by licensing photos to the parties that commissioned those photos, Gratz Decl. Ex. 3 at 55, 154:8-15, and through a website AAP operates, StockImageDepot.com. The images distributed directly by AAP have at least some camera metadata. Gratz Decl. ¶ 9. But after those photos are licensed to the party that commissioned them, the same photos are thereafter available for licensing on the StockImageDepot.com site, and when those images are licensed at the "1600px" size (rather than the "Original" size), they do not contain any metadata, because—like CoreLogic's software—Plaintiff's software does not retain metadata when images are resized. Seiden Decl. Ex. A ¶¶ 44-48.

Indeed, metadata may have been lost at various points in the chain between the

photographer and the upload.  Vandel testified that he has licensed photographs to homeowners, rather than real-estate agents—and that those homeowners in turn provided those photos to their real-estate agent at some later time, and that the agent subsequently uploaded the image to an MLS.  Gratz Decl. Ex. 1 at 4, 10:10-24.  If anyone in the chain of custody of the photos used a tool that does not copy metadata, any metadata that was on the image at the time it left the possession of the photographer would not have been present at the time the image was uploaded to an MLS using CoreLogic's software.

### 3. Class membership depends on which version of CoreLogic's software was involved in the image upload.

In order for an image to meet the criteria set forth in the class definition, even if the photographer put CMI metadata on the image, and even if that CMI metadata remained intact at the time the image was uploaded, the CoreLogic software would still need to have failed to copy the CMI metadata as a side-effect of the image-uploading process. Whether that occurred varies from MLS to MLS.  Specifically, the Matrix software package, which is used on approximately 65 MLSes (or about half of all those running CoreLogic MLS software), copied, verbatim, the entirety of uploaded image files when those image files were already of a size that did not need to be scaled down—that is, they matched, or were smaller than, the image-size setting for that particular MLS.  Troy Decl. ¶¶ 5 & 9.  CoreLogic does not maintain records of when the Matrix software resizes photographs.  Thus, for MLSes running the Matrix software, the *only* way to determine whether CoreLogic software resized an image in the course of uploading it is to compare the size of the particular image file that was uploaded with the "maximum size" setting for the particular MLS to which that image was uploaded at the time the image was uploaded (because those maximum size settings have changed over time).  In order to perform that comparison, one must ascertain to which MLS the photo was uploaded. That information may or may not be known to class members.  If the class member does not know, CoreLogic cannot look it up just given an image file, because CoreLogic's software does not have image-matching functionality.  Troy Decl. ¶ 6.  And in at least some cases, class

14

members will have no way of knowing:  Plaintiff Affordable Aerial Photography operates an automated website through which it licenses its photos, and does not collect information about which MLS the photo will be uploaded to as part of the licensing process.  Gratz Decl. ¶ 8.

If the image was uploaded to an MLS that was running the Matrix software, one would need to know the size of the image file that was originally uploaded to know whether it had been resized.  That information is not known to CoreLogic and may be impossible to determine.  In many cases, the image may have been uploaded at a size that did not require resizing, as Plaintiff Vandel testified was his practice and the "standard operating procedure" among real-estate photographers.  Gratz Decl. Ex. 1 at 15-18, 59:23-60:12; 61:23-62:3.  The size of the original image is knowable, if at all, only as a result of investigation on the part of each class member.  And, if the images were resized or edited by a third party before uploading, the class member would not have any record of that, and neither would CoreLogic.

Nor can any of these ascertainability problems be fixed by modifying the class definition.  There is a reason that there has *never* been a class action under 17 U.S.C. § 1202.  If the class definition were modified to remove the requirement that CMI metadata was present in the image when it was uploaded, or the requirement that CMI metadata was removed from the image as a side-effect of the uploading process, the same individualized inquiries would still need to be performed, because both of those facts would need to be proven to make out a claim under § 1202.  Modifying the class definition to solve these fatal ascertainability problems, for that reason, would simply turn them into fatal predominance problems.

## C.     The Rule 23(a) Requirements

### 1.     Numerosity

In exchange for Plaintiffs' agreement not to seek discovery regarding absent class member photos, CoreLogic agreed to forbear from challenging class certification on the ground that the prerequisite for class certification contained in Federal Rule of Civil

Procedure 23(a)(1) is not met under the class definition set forth in the SAC. In reliance on that agreement, CoreLogic does not challenge certification on that ground.

### 2. Existence of at least one common question

While CoreLogic does not agree with the formulation of Plaintiffs' proffered "common questions," CoreLogic does not challenge certification on the basis of the commonality inquiry—that is, whether there is even a *single* common question whose answer is relevant to all class members. There is one such question: Whether CoreLogic, at the time it wrote the image-resizing routines that turned out to have the side effect of not copying image metadata (i.e., at the time of the alleged "violation"), had the state of mind required by 17 U.S.C. § 1203. CoreLogic believes that the answer to that question will defeat all of the claims in this case in a single stroke. But, as discussed below with respect to the predominance requirement, even if that question is resolved in Plaintiffs' favor, there are numerous photographer-by-photographer and photograph-by-photograph inquiries that the court would need to resolve next.

### 3. Typicality

"The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). "[C]lass certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Id.* (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)). Here, while Plaintiffs claim that they were injured by a common course of conduct, individualized defenses are likely to predominate in the litigation (as discussed below with respect to the predominance requirement). For example, each of the named Plaintiffs *sometimes* used visible CMI their images that also (they allege) contained invisible CMI metadata which was not removed in the image-resizing process. While that practice is not unique to them,

it is not common to all class members.  As discussed below, that practice provides CoreLogic with the additional defense that CoreLogic cannot possibly have had any grounds to know that the loss of metadata as a side-effect of the image-resizing process would in any way help copyright infringement, because copyright ownership information remained intact, in a more accessible form, right on the face of the image.  That issue will require substantial litigation—litigation specific to these named Plaintiffs' particular practices, and not on issues common to the class as a whole.

### 4.    Adequacy of representation

"Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  While CoreLogic has no doubt that the named Plaintiffs and their counsel will prosecute the action vigorously, two of the Plaintiffs and their counsel have conflicts that disqualify them from representing this class because of pending intra-class litigation:  Affordable Aerial Photography, represented by putative class counsel Joel B. Rothman, has a number of pending lawsuits against real-estate agents.  Complaint, *Affordable Aerial Photography, Inc. v. Virtual Global Realty LLC*, No. 9:15-cv-81037-JIC (S.D. Fla. July 24, 2015) (suing a real-estate agency and six individual real-estate agents) (action pending); Complaint, *Affordable Aerial Photography, Inc. v. Realty Associates Florida Properties, Inc.*, No. 9:15-cv-80355-DMM (S.D. Fla. Mar. 18, 2015) (suing two real-estate agencies and four individual real-estate agents) (action pending).  But real-estate agents are also members of the putative class.  Gratz Decl. Ex. 3 at 50-52, 61:12-63:1; McQueen Decl. Ex. A ¶ 16.b.  As a result, Affordable Aerial Photography and its principal, Robert Stevens, are not adequate class representatives, and Mr. Rothman is not adequate class counsel.  CoreLogic does not intend to impugn the integrity or skill of counsel, but only to point out that counsel is attempting to represent, on a class basis, parties who are presently his litigation adversaries, and that means that the adequacy requirement is not met.

### D.    No Class May Be Certified Under 23(b)(2)

Plaintiffs are "seeking individualized monetary claims and not solely injunctive relief," and for that reason, certification of a class under Rule 23(b)(2) is not appropriate. *Stemple v. QC Holdings, Inc.*, No. 12-cv-01997-BAS (WVG), 2014 WL 4409817, at *9 (S.D. Cal. Sept. 5, 2014).  *See also Connelly v. Hilton Grand Vacations Co*., 294 F.R.D. 574, 579 (S.D. Cal. 2013) (declining to certify a Rule 23(b)(2) class where "each plaintiff is independently entitled to statutory damages. . . .").

### E.    The Rule 23(b)(3) Requirements Are Not Met

####     1.    Individual questions, not common questions, predominate.

#####         a.    The Law of Predominance

Before a class can be certified, Rule 23(b)(3) requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members."  *See generally Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594, 609 (S.D. Cal. 2015).  "The predominance inquiry focuses on 'the relationship between the common and individual issues' and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling a dispute on a representative rather than on an individual basis."  *In re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386, 395 (N.D. Cal. 2009) (citation omitted).  In contrast, when "claims require a fact-intensive, individual analysis," then class certification will "burden the court" and be inappropriate.  *Vinole,* 571 F.3d at 947; *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) ("[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate[.]") (citation omitted).

Though there is substantial overlap between Rule 23(a)(2)'s commonality and Rule 23(b)'s predominance tests, the latter is a "far more demanding" standard.  *Wolin v.*

18

*Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)).

Where liability turns on a transaction that "involves not only the exchange of written documents but also considerable oral and written discussions between the individual" parties, "[t]hose discussions are not subject to common proof, but rather raise individual issues that predominate over any other common issues in this case." *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, No. 08md1988 DMS (WMC), 2011 WL 6325877, at *10 (S.D. Cal. Dec. 16, 2011). Where a plaintiff's claims "necessarily require an examination of the in-person oral representations," and those oral representations were not "predicated on common, standardized sales materials," the predominance requirement is not met. *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 496 (C.D. Cal. 2006). *See also, e.g.*, *Howard v. Gap, Inc.*, No. C 06-06773 WHA, 2009 WL 3571984, at *4 (N.D. Cal. Oct. 29, 2009) (predominance requirement was not met where determining liability would require evidence of the differing oral statements made by retail-store managers to employees regarding appropriate attire).

Similarly, where at least some class members consented to the allegedly wrongful conduct, and others allegedly did not, the individualized inquiry regarding which class members consented defeats predominance. *See, e.g.*, *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, No. 12-cv-01685-BAS (JLB), 2015 WL 1309938, at *7 (S.D. Cal. Mar. 24, 2015) ("Given the specific factual circumstances in this case, the Court agrees that individual inquiries into whether each putative class member provided consent will be necessary."); *Connelly*, 294 F.R.D. at 578 (where the defendant obtained the class members' cell phone numbers in a variety of different interactions, some of which indicated consent to telemarketing calls and others of which did not, the predominance requirement was not satisfied). Questions of implied consent, as well as express consent, will defeat predominance if they are individualized. *In re Google Inc. Gmail Litig.*, No. 13-MD-02430-LHK, 2014 WL 1102660, at *15 (N.D. Cal. Mar. 18, 2014) ("the Court finds that individualized questions regarding implied consent will

overwhelm any common issues. . . .").

      **b.**     **Individualized inquiry is required to determine whether particular class members are contractually barred from bringing their claims.**

     As discussed above, many people who take photographs that are uploaded to MLSes are themselves real-estate agents and brokers.  Some—but not all—MLSes require member agents and brokers to enter into agreements specifically forbidding the agents from challenging the MLS's rights to use those photographs.  For instance, the REcolorado agreement states, in part, "REcolorado may use, or may arrange for third parties to use, the information, data, and tangible or intangible property items in products and services. . . . By the act of submitting any real estate data and information to REcolorado, the Participant and his/her Licensees hereby consent to such uses and warrant that they will not challenge, interfere with or violate such uses, and warrant that they will not seek compensation therefore."  Gratz Decl. Ex. 5 at 68 ¶ 1(c).  Likewise, the CTMLS agreement states "Participant agrees not to challenge MLS's rights in and to the MLS Database or to take any action inconsistent with the license granted to the Listing Content under this Agreement."  Gratz Decl. Ex. 6 at 74 ¶ 7(c).

     The claims in this lawsuit constitute a "challenge" to the rights of the MLSes in the photographs uploaded by real-estate agents and brokers—because if the MLSes had the rights, CoreLogic would, too, by virtue of its agreements with them.  In order to determine whether a particular class member's claim is barred, the court would need to examine the agreements entered into between that class member and the MLS or MLSes to which he or she belongs.  Courts regularly reject class actions where many individuals who may fall within the class definition are contractually barred from bringing claims.  *See, e.g.*, *Guzman*, 305 F.R.D. at 612.

      **c.**     **Each class member's differing license terms requires an individualized inquiry that defeats predominance.**

     The statute under which Plaintiffs bring suit requires Plaintiffs to prove that CoreLogic acted "without the authority of the copyright owner or the law": in other

words, whether CoreLogic *in fact* had permission to remove CMI metadata from image files that were uploaded.  17 U.S.C. § 1202(b).  That threshold question will necessarily require individualized inquiry.

CoreLogic is authorized to copy, display, and (crucially) modify photos uploaded to MLSes by virtue of its contracts with MLSes.  McQueen Decl. Ex. A ¶¶ 12-19.  Plaintiffs will contend that these contracts are not enough, because the MLSes could not grant licenses broader than the licenses they received from their member real-estate agents by virtue of their agreements with those agents, and those agents could not grant licenses broader than the licenses they received from the photographer.  But Plaintiffs' argument does not apply to the class members who are also real-estate agents or brokers, and there is no way to tell from looking at the photographs on an MLS whether they were taken by a real-estate agent or a professional photographer (unless the photograph contains a visible watermark).

Moreover, even as to professional photographers, in order to determine whether or not the MLSes could grant CoreLogic permission to modify the uploaded photos, it is necessary to determine the scope of the license originally granted by the photographer to the agent.  Determining the scope of those licenses will necessarily involve an individualized inquiry into individual licensing practices—and, in some cases, into the circumstances of individual licensing transactions.  The licensing practices of the named Plaintiffs demonstrate why this is so.  To the extent that the terms on Vandel's website are applicable to **any** of Vandel's photographs (given that his testimony that he never directed any licensees to review those restrictions), the court will need to interpret those license terms and determine whether they permit or prohibit the agent to sublicense the MLS, and the MLS to sublicense CoreLogic, to use and modify the photos.  And with respect at least to all of Vandel's photo-licensing transactions before he placed that text on his website in 2014, the court will need to inquire into the oral communications that took place during those transactions to ascertain what the licensing terms might have been.

There is no reason to think that the absent class members are more consistent in

their licensing practices than the named Plaintiffs.  (Indeed, if they were, it would defeat the separate requirement that the named plaintiffs be typical of absent class members.)  Class members have their own business practices and made their own choices with respect to the scope of the license they granted.  Perhaps some of them (unlike the named Plaintiffs) explicitly prohibited modification of the licensed photos.  But to find out, the court will need to take evidence from each absent class member.  And if they are anything like Vandel, that will involve evidence about oral business dealings conducted years ago.  Individual issues predominate over common ones with respect to the scope of the license granted by class members.

### d.   Individualized issues predominate with respect to CoreLogic's implied license defense.

Some but not all photographs are uploaded to an MLS by the rightsholder, either because a real-estate agent snapped the picture and then uploaded it or because a professional photographer uploaded the photograph directly.  Gratz Decl. Ex. 3 at 50-51, 61:16-62:9.  In this circumstance, the rightsholder has granted CoreLogic an implied license with respect to the operation of the CoreLogic software.  An implied license arises where the licensor's words or conduct manifest an intention to permit the challenged conduct to occur.  *See Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008).  A rightsholder who chose to upload a photo using software manifested assent to the operation of that software in doing so.  Plaintiffs may respond that they did not know how the CoreLogic software worked, even though that information can be readily determined by looking at the metadata fields on the photos after they are uploaded.  That argument fails on the law, because the standard for assent is an objective one, measured by the conduct of the parties, *id.* at 756, and on the facts, because if Plaintiffs cared they had only to check.  But it makes no difference to this motion, because a licensor's knowledge and intent would themselves present individualized questions that could not be resolved on a classwide basis.

### e. Individual questions predominate with respect to the scope of the license or transfer of rights granted to the MLS.

As discussed above with respect to ascertainability, it is likely to be impossible, in many circumstances, to determine reliably which MLS a given class member photo was uploaded to. But even in the cases where that determination could be made, it simply leads to a different predominance problem: each of the more than one hundred MLSes that use CoreLogic software has drafted its own agreement with the real-estate agents who make up its membership and who create listings on the MLS. If Plaintiffs are to meet their burden of proving that CoreLogic lacked authorization to modify the photos that were uploaded, Plaintiffs will need to provide evidence of each one of those more than one hundred agreements. CoreLogic is of the view that they all provide the MLS with the rights necessary to sublicense CoreLogic, authorizing CoreLogic to modify the photos at issue; if Plaintiffs take a different view, the Court will need to interpret each agreement.

### f. Individual questions predominate with respect to whether visible CMI was present.

Some photographers use watermarks and others do not. Because the image-resizing process does not change what is visually depicted in the image being resized (instead merely making the whole image smaller), those watermarks remain intact in all photos uploaded to MLSes that use CoreLogic's software. Where the image bears the legend "(c) Square Foot Studios" or "(c) Robert Stevens," one does not need to view metadata to see whose photo it is; it says right there on the photo. In those circumstances, the loss of metadata as a side-effect of the image-resizing process cannot possibly make any difference to the ability to prevent or detect copyright infringement.

In order to prove their claim, Plaintiffs would need to show that CoreLogic removed CMI "having reasonable grounds to know[] that it will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b). In instances where CMI remained intact on the face of the photo, CoreLogic cannot possibly have had any grounds to know that the loss of metadata as a side-effect of the image-

23

resizing process would in any way help copyright infringement.

For these reasons, Plaintiffs would need to show that there was not CMI on the face of the image in order to show an act of infringement as to a particular photo.  That inquiry requires at least investigation in to the practices of each class member—and very likely, as in the case of Vandel, a photo-by-photo inquiry where those practices were not applied consistently.  This individualized inquiry further demonstrates why common questions do not predominate.

> **2.    A class action is not superior to other available methods for fairly and efficiently adjudicating the controversy.**

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy. . . ."  7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 1779 at 174 (3d ed. 2005).  Rule 23(b)(3)'s superiority test requires the court to determine whether maintenance of the litigation as a class action is efficient and whether it is fair.  *Wolin*, 617 F.3d at 1175-76.

Courts have held that the superiority requirement is less likely to be satisfied where the underlying statute provides for sizable statutory damage awards and attorney-fee awards to successful plaintiffs, because it looks to whether there are sufficient incentives for individual litigation.  For example, in *Antoninetti v. Chipotle Mexican Grill, Inc.*, No. 06cv02671 BTM (WMc), 2012 WL 3762440, at *7 (S.D. Cal. Aug. 28, 2012), this Court held that there was "no advantage with respect to judicial economy in certifying the issue of whether putative class members are entitled to statutory damages under the Unruh Act" because "[t]he Unruh Act allows minimum statutory damages in the amount of $4,000 *for each particular occasion*, providing individuals with a significant monetary incentive to file individual lawsuits."  The availability in this case of statutory damages ranging from $2,500 to $25,000 and attorneys' fees provides individuals with a significant monetary incentive to file individual lawsuits, weighing against a finding of superiority.  *See* 17 U.S.C. § 1203(b)(5); *Antoninetti*, 2012 WL 3762440, at *7.

Indeed, there have been numerous individual suits under § 1202.  The sheer number of individual § 1202 cases resulting in substantive written opinions so far in 2015 shows that individual actions provide adequate avenues for relief.[4]

## IV.   CONCLUSION

There has never been a class action under § 1202.  Because of insoluble problems with ascertainability and predominance, there likely never will be—and this case certainly should not be the first.

---

[4] *See Watson v. Kappa Map Grp., LLC*, No. 1:14-CV-100-TWT, 2015 WL 3932425, at *2 (N.D. Ga. June 25, 2015) (granting summary judgment to defendant); *Hanover Architectural Serv., P.A. v. Christian Testimony-Morris, N.P.*, No. 2:10-5455 (KM), 2015 WL 3462889, at *19 (D.N.J. May 18, 2015), *reconsideration denied*, No. 2:10-5455 KM, 2015 WL 4461327 (D.N.J. July 21, 2015) (denying summary judgment due to dispute over whether CMI was "removed"); *McPherson v. Seaduced, LLC*, No. 8:14-cv-2315-T-33EAS, 2015 WL 1811029, at *5 (M.D. Fla. Apr. 21, 2015) (entering default judgment and awarding $5,000 in damages under § 1202); *Geophysical Servs., Inc. v. TGS-Nopec Geophysical Servs.*, No. 14-1368, 2015 WL 1461235, at *12 (S.D. Tex. Mar. 30, 2015) (dismissing § 1202 claims without prejudice); *Guzman v. Hacienda Records, L.P.*, No. 6:13-CV-41, 2015 WL 789113, at *3 (S.D. Tex. Feb. 24, 2015) (denying summary judgment on § 1202 claim due to factual dispute over whether copyright was transferred); *Williams v. Cavalli*, No. CV 14-06659-AB, 2015 WL 1247065, at *4 (C.D. Cal. Feb. 12, 2015) (denying motion to dismiss § 1202 claims); *Murphy v. Millennium Radio Grp. LLC*, No. 08-1743 MAS, 2015 WL 419884, at *6 (D.N.J. Jan. 30, 2015) (denying summary judgment on § 1202 claim due to factual dispute over defendant's state of mind); *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-00496 SOM, 2015 WL 263556, at *4 (D. Haw. Jan. 21, 2015), *appeal docketed*, No. 15-15802 (9th Cir. Apr. 22, 2015) (denying motion to reconsider grant of summary judgment to defendant on § 1202 claim); *Kober Hanssen Mitchell Architects, Inc. v. Wilson Care Home Kailua, LLC*, No. 14-00479 DKW, 2015 WL 237322, at *4 (D. Haw. Jan. 16, 2015) (denying motion to dismiss § 1202 claim on statute-of-limitations grounds); *Fischer v. Forrest*, No. 14 CIV. 1304 (PAE), 2015 WL 195822, at *9 (S.D.N.Y. Jan. 13, 2015) (denying motion to dismiss § 1202 claim).

Dated:  August 3, 2015

DURIE TANGRI LLP

By: _____
/s/ Joseph C. Gratz
JOSEPH C. GRATZ

Attorneys for Defendant
CORELOGIC, INC.
jgratz@durietangri.com

DEFENDANT CORELOGIC, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:14-CV-01158-BAS-JLB

1

**CERTIFICATE OF SERVICE**

2

      I certify that all counsel of record is being served on August 3, 2015 with a copy of

3

this document via the Court's CM/ECF system.

4

                                        */s/ Joseph C. Gratz*

5

                                         JOSEPH C. GRATZ

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT CORELOGIC, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:14-CV-01158-BAS-JLB